IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MARK MULLANEY and LYNETTE MULLANEY, | )  Civ. No. 07-00313 ACK-LEK |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| HILTON HOTELS CORPORATION d/b/a/ HILTON WAIKOLOA VILLAGE, a Delaware corporation, and ATTCO, INCORPORATED, a Hawaiʻi corporation, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AND
DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

PROCEDURAL HISTORY

On June 8, 2007, Plaintiffs, Mark Mullaney ("Mr. Mullaney") and Lynette Mullaney ("Mrs. Mullaney"), husband and wife, filed a complaint ("Complaint") against Defendants, Hilton Hotels Corporation d/b/a Hilton Waikoloa Village ("Hilton" or "Hil.") and ATTCO, Incorporated ("ATTCO" or "ATT.").[1/]  The gist of this action is that, while attending an expo at a hotel, Mr. Mullaney was seriously injured when a large registration booth fell on him.  The hotel was owned and operated by Hilton, and the booth was provided and assembled by ATTCO.  Plaintiffs advance

_____

[1/] The Complaint was also filed against Hilton Waikoloa, LLC, but the parties subsequently stipulated to the dismissal of the Complaint and claims therein against that Defendant without prejudice.

seven counts in the Complaint, specifically alleging claims of negligence (count I), strict products liability (count II), breach of warranty (count III), failure to take precautions and to warn (count IV), premises liability (count V), gross negligence (count VI), and punitive damages (count VII).  Compl. ¶¶ 11-31.  In addition, Mrs. Mullaney asserts claims of emotional distress and loss of consortium.  Id. ¶ 36.

Presently before the Court are a total of six motions for partial summary judgment that were filed on March 11, 2009. The parties thereafter filed responses and replies pertaining to the motions.  Two of the motions were filed by Defendants and the other four were filed by Plaintiffs.

First, Hilton filed a motion for summary judgment as to counts II, III, IV, VI, and VII ("Hil.'s Mot."), along with a memorandum in support ("Hil.'s Mem.") and a separate and concise statement of facts ("SCSF").  Plaintiffs filed a memorandum in opposition to the motion ("Pls.' Opp'n to Hil.'s Mot.") and a separate and concise statement of facts.  Hilton filed a reply in support of its motion ("Hil.'s Reply") along with a separate and concise statement of facts.

Second, like Hilton, ATTCO filed a motion for summary judgment as to counts II, III, IV, VI, and VII ("ATT.'s Mot."), accompanied by a memorandum in support ("ATT.'s Mem.") and a separate and concise statement of facts.  Plaintiffs filed a

2

memorandum in opposition to the motion ("Pls.' Opp'n to ATT.'s Mot.")[2] along with a separate and concise statement of facts. ATTCO filed a reply to Plaintiffs' opposition ("ATT.'s Reply") accompanied by a separate and concise statement of facts.[3]

Third, Plaintiffs filed a motion for summary judgment against ATTCO with respect to counts I, II, and III ("Pls.' ATT. Mot."), as well as a memorandum in support ("Pls.' ATT. Mem.") and a separate and concise statement of facts. ATTCO filed a memorandum in opposition to the motion ("ATT.'s Opp'n to Pls.' ATT. Mot.") and a separate and concise statement of facts. Hilton filed a statement of no position as to the motion. Plaintiffs filed a reply memorandum in support of their motion ("Pls.' ATT. Reply").

---

[2] Exhibit E to Hilton's separate and concise statement of facts is a photograph of the registration booth that was apparently taken prior to the incident.  In their opposition, Plaintiffs advance arguments regarding Hilton's spoliation of other photographs of the scene that were allegedly in its possession.  Pls.' Opp'n to Hil.'s Mot. 7-10.  Plaintiffs have filed a motion on the issue of spoliation that is presently before Magistrate Judge Leslie E. Kobayashi.  The Court therefore declines to address Plaintiffs' spoliation arguments at this juncture.

[3] ATTCO and Plaintiffs have attached declarations of counsel and exhibits to their motions and oppositions.  The declarations and exhibits should have instead been attached to their separate and concise statements of fact in view of Rule 56.1(h) of this Court's Local Rules of Practice, which states that "[a]ffidavits or declarations setting forth facts and/or authenticating exhibits, as well as exhibits themselves, shall only be attached to the concise statement."

Fourth, Plaintiffs filed a motion for summary judgment against Hilton regarding their failure to warn claim ("Pls.' Hil. Mot."), accompanied by a memorandum in support ("Pls.' Hil. Mem."). Plaintiffs thereafter filed a separate and concise statement of facts. Hilton filed an opposition ("Hil.'s Opp'n to Pls.' Hil. Mot.") and a separate and concise statement of facts. ATTCO filed a statement of no position as to the motion. Plaintiffs filed a reply memorandum in support of their motion ("Pls.' Hil. Reply").

Fifth, Plaintiffs filed a motion for summary judgment as to the defenses of assumption of risk, contributory negligence, and comparative negligence ("Pls.' Assum. & Neg. Mot."), along with a memorandum in support ("Pls.' Assum. & Neg. Mem."). Plaintiffs thereafter filed a separate and concise statement of facts. ATTCO filed a statement of no position as to the motion, and Hilton filed a statement of no opposition.

Sixth, Plaintiffs filed a motion to strike the defenses of failure to name an indispensable party, "wrong party," and lack of jurisdiction, as well as the blanket defenses asserted in Defendants' answers regarding all applicable affirmative defenses ("Pls.' Misc. Defense Mot."). Hil.'s Answer ("Ans.") ¶¶ 44, 46, 48–49; ATT.'s Ans. ¶¶ 26–28, 31, 34. Plaintiffs also requested a conclusive determination of certain facts that Defendants have admitted. Plaintiffs' motion was accompanied by a memorandum in

4

support ("Pls.' Misc. Defense Mem.").  They subsequently filed a

separate and concise statement of facts.[4/]  Hilton and ATTCO

filed oppositions to the motion (respectively, "Hil.'s Opp'n to

Pls.' Misc. Defense Mot." and "ATT.'s Opp'n to Pls.' Misc.

Defense Mot.") and separate and concise statements of fact.

Plaintiffs filed a reply in support of their motion ("Pls.' Misc.

Defense Reply").

On June 22, 2009, the Court held a hearing on the

parties' motions.

---

[4/] Plaintiffs' separate and concise statements of fact in
support of their two motions regarding certain defenses were
filed more than two months after the motions were filed.  Under
Rule 56.1(a) of this Court's Local Rules of Practice, "[a] motion
for summary judgment shall be accompanied by a supporting
memorandum and separate and concise statement."  Plaintiffs'
separate and concise statements of fact plainly did not
"accompan[y]" the motions and were therefore untimely under Local
Rule 56.1(a).  Defendants do not assert that they have been
prejudiced by the delay and, as such, remedial action is neither
necessary nor appropriate at this time.
    In addition, Plaintiffs' separate and concise statement of
facts in support of their motion for summary judgment against
Hilton regarding the failure to warn claim was filed six days
after the motion.  Thus, the statement did not "accompan[y]" the
motion, as required by Local Rule 56.1(a).  Hilton argues that
the motion should be denied for that reason alone.  Hil.'s Opp'n
to Pls.' Hil. Mot. 10 n.3.  Local Rule 11.1 provides that:
"Failure of counsel or of a party to comply with any provision of
these rules is a ground for imposition of sanctions."  The Court
need not decide whether a sanction as serious as denying the
Plaintiffs' motion would be appropriate here because it
ultimately denies Plaintiffs' motion on the merits.

## FACTUAL BACKGROUND[5/]

On January 5, 2006, Mr. Mullaney was attending the Hawaii International Dairy Queen ("IDQ") expo at the Hilton Waikoloa Village, which was owned and operated by Hilton and located in the County of Hawai'i on the Big Island.  Compl. ¶ 5; Hil.'s Ans. ¶ 4.  At approximately 7:00 p.m., he walked to the IDQ expo administration booth ("Booth"), which was located outdoors at the grand staircase landing of the hotel.  Compl. ¶ 7; ATT.'s Mot., Ex. B at 6 (Pls.' Resp. to Interrogs.); Dep. of Agnes Mui ("Ms. Mui"), senior events manager at the Hilton Waikoloa Village, at 11, attached as Ex. A to Hil.'s Mot. SCSF; Pls.' Assum. & Neg. Mot. SCSF ¶ 5.

The Booth was provided and assembled by ATTCO pursuant to a contract with IDQ.  Compl. ¶ 5; ATT.'s Ans. ¶ 4; Hil.'s Ans. ¶ 4; ATT.'s Mot. SCSF ¶¶ 4, 8; ATT.'s Mot., Ex. D at 13 (ATT.'s Resp. to Interrogs.); Dep. of Ms. Mui 10, 45, attached as Ex. A to Hil.'s SCSF; Hil.'s Mot. SCSF, Ex. C (ATTCO's contract with IDQ).  It consisted of five registration counter units, each approximately ninety-seven inches tall, seventy-nine inches wide, and twenty inches deep.  Dep. of Daniel Anderson ("Mr. Anderson"), vice-president of sales at ATTCO, at 25-26, attached

_____

[5/] Except for the facts specifically determined in Subsection VIII of the Discussion Section below, the facts in this Order are recited for the limited purpose of deciding the motions for summary judgment and shall not be construed as findings upon which the parties may rely in future proceedings.

as Ex. B to Hil.'s' Mot. SCSF; Dep. of Kiumars Siah ("Mr. Siah"),
ATTCO's proffered expert in engineering, at 20-22, attached as
Ex. 1 to Pls.' ATT. Mot.; Pls.' Assum. & Neg. Mot. SCSF ¶ 7.  The
five registration units were set up in a continuous configuration
to form the Booth.  Dep. of Mr. Anderson 25-26, attached as Ex. B
to Hil.'s Mot. SCSF; Pls.' Assum. & Neg. Mot. SCSF ¶ 7.  The
Booth weighed approximately 725 pounds.  Pls.' ATT. Mot. SCSF
at 3.

        While at the Booth, Mr. Mullaney picked up his
registration materials and spoke with IDQ employees, Debbie
Lorenzen ("Ms. Lorenzen") and Michael Ochs ("Mr. Ochs").  Compl.
¶ 7; ATT.'s Mot., Ex. B at 6 (Pls.' Resp. to Interrogs.).  The
area where the Booth was located was windy, but Mr. Mullaney did
not see the Booth moving in any way.  Pls.' Assum. & Neg. Mot.
SCSF ¶¶ 9, 11.  As he turned to walk away, a strong gust of wind
blew the Booth over, causing it fall on him.  Compl. ¶ 7; ATT.'s
Mot., Ex. B at 6 (Pls.' Resp. to Interrogs.); ATT.'s Mot. SCSF
¶ 5; ATT.'s Mot., Ex. E at 2-3 (Report of Clyde F. Calhoun ("Mr.
Calhoun"), Plaintiffs' proffered expert in engineering); Dep. of
Mr. Calhoun 94-95, attached as Ex. F to ATT.'s Mot.; Pls.' Assum.
& Neg. Mot. SCSF ¶ 12.  Mr. Mullaney consequently sustained
injuries.  Compl. ¶ 7; Hil.'s Ans. ¶ 4.

## LEGAL STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation omitted).[6/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Only admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).

---

[6/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323; <u>Miller</u>, 454 F.3d at 987. The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.[7] Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. <u>See</u> <u>id.</u> at 323; <u>Matsushita Elec.</u>, 475 U.S. at 586; <u>Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).[8] The nonmoving party must instead set forth "significant probative evidence" in support of its position. <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment will thus be granted against a party who fails

---

[7] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. <u>Miller</u>, 454 F.3d at 987. When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. <u>Id.</u>

[8] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002); <u>see also</u> <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

to demonstrate facts sufficient to establish an element essential
to his case when that party will ultimately bear the burden of
proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the
court must construe all evidence and reasonable inferences drawn
therefrom in the light most favorable to the nonmoving party.
See T.W. Elec. Serv., 809 F.2d at 630-31.[9/]  Accordingly, if
"reasonable minds could differ as to the import of the evidence,"
summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

## DISCUSSION

The Court will initially address the parties' arguments
regarding the counts in the Complaint.  The Court will then
evaluate Plaintiffs' contentions as to the validity of certain
defenses set forth in Defendants' answers, as well as their
request for a determination of basic facts.

**I.   Count II of the Complaint:  The Scope of the Strict Products
       Liability Doctrine**

In count II of the Complaint, Plaintiffs allege a
strict products liability claim against Hilton and ATTCO.  Compl.
¶ 13.  Hilton argues that the Booth was not its "product" for
purposes of Hawai'i strict products liability law.  Hil.'s
Mem. 7, 9.  It insists that it did not design, manufacture, or

---

[9/] At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.  Anderson,
477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
1994).

commercially distribute the Booth.  Id. at 9.  ATTCO appears to argue that the Booth was not its "product" in asserting that it did not design, manufacture, or lease the Booth.  See ATT.'s Mem. 8-9; ATT.'s Reply 3-5.  ATTCO further contends that the strict products liability doctrine does not apply because Mr. Mullaney was not a "consumer" of the Booth.  ATT.'s Mem. 10. Finally, ATTCO argues that, even if the doctrine applies, it is nevertheless entitled to summary judgment because Plaintiffs have no evidence that the Booth was defective.  Id. at 10-13.  The issue of defect will be considered in Section II below.  In this Section, the Court will discuss the scope of the strict products liability doctrine and then determine whether the doctrine applies to Defendants.

**A.   Lessors, Consumers, and Users of Products Under the Strict Products Liability Doctrine**

This Court is sitting in diversity and will therefore apply the Hawai'i substantive law.  See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 426-27 (1996); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Under Hawai'i strict products liability law, the rule is that

> one who sells or leases a defective product
> which is dangerous to the user or consumer or
> to his property is subject to liability for
> physical harm caused by the defective product
> to the ultimate user or consumer, or to his
> property, if (a) the seller or lessor is
> engaged in the business of selling or leasing
> such product, and (b) the product is expected
> to and does reach the user or consumer

11

> without substantial change in its condition
> after it is sold or leased.

Stewart v. Budget Rent-A-Car Corp., 52 Haw. 71, 75, 470 P.2d 240,

243 (1970); see also Ontai v. Straub Clinic & Hosp., 66 Haw. 237,

241, 659 P.2d 734, 739 (1983) (paraphrasing the foregoing rule).

The policies underlying this rule are:

> that the public interest in human life and
> safety requires the maximum possible
> protection that the law can muster against
> dangerous defects in products; that by
> placing the goods on the market the maker and
> those in the chain of distribution represent
> to the public that the products are suitable
> and safe for use; and that the burden of
> accidental injuries caused by defective
> chattels should be placed upon those in the
> chain of distribution as a cost of doing
> business and as an incentive to guard against
> such defects.

Stewart, 52 Haw. at 74-75, 470 P.2d at 243.

In Leong v. Sears Roebuck & Co., 89 Hawai'i 204, 970

P.2d 972 (1998), the Hawai'i Supreme Court held that an escalator

located in a department store was not the department store's

"product" for purposes of the doctrine of strict products

liability, because the store did not manufacture or commercially

distribute the escalator. Id. at 211, 970 P.2d at 979. The

court further explained that the rationales underlying the

doctrine do not justify imposing strict liability on the

department store. Id. The court reasoned that the store could

not adjust the costs of protecting the consumer up the chain of

distribution, the store was unable to protect against defects by

12

means of the exercise of greater care during manufacture and assembly, and the store could not be presumed to have expertise necessary to know of and correct defects in its escalators.  Id.

On the other hand, the court concluded that the escalator was the "product" of the commercial manufacturer and distributor of the escalator.  Id.  The court reasoned that the application of the strict products liability doctrine to those entities would further the policies underlying the strict products liability doctrine.  Id.  The court explained that applying the doctrine to the manufacturer and distributor would afford maximum protection to persons injured by defective products and would create incentives for the entities to guard against defects in the future.  Id.  The court further noted that the manufacturer and distributor were positioned most appropriately to shoulder the risk of accidental injuries caused by defective escalators as a cost of doing business.  Id.

**B.   Analysis**

Turning to the facts at hand, IDQ contracted with the Hilton Waikoloa Village to hold the Hawaii IDQ expo on the hotel's premises.  Dep. of Ms. Mui 41-42, attached as Ex. I to ATT.'s Mot.  IDQ also contracted with ATTCO for ATTCO to, among other things, provide and set up the Booth for the event.  Hil.'s Mot. SCSF ¶ 4; id., Ex. C (ATTCO's contract with IDQ).  ATTCO

13

therefore provided and assembled the Booth.  Hil.'s Mot. SCSF
¶ 7.

ATTCO purchased the Booth's metal components from a
company called AGAM.  Hil.'s Mot. SCSF ¶ 7; Dep. of Mr.
Anderson 27, attached as Ex. B to Hil.'s Mot. SCSF.  Those
components were assembled pursuant to a design set forth in
AGAM's sales manual.  Dep. of Mr. Anderson 44, 70, attached as
Ex. H to ATT.'s Mot.  However, only the metal components of the
Booth were obtained from AGAM.  Dep. of Mr. Anderson 27, attached
as Ex. B to Hil.'s Mot. SCSF.  ATTCO obtained the Booth's
facades, finishes, panels, countertops, and lighting fixtures
elsewhere.  Id.  AGAM does not sell configured registration
counters.  Id.  ATTCO purchased components from AGAM, but
configured the registration counters to its own design.  Id.
Thus, the actual configuration of the Booth was ATTCO's design,
as opposed to AGAM's design.  Id.

For example, ATTCO has, prior to the incident at issue
here, configured a registration booth to be anchored down with
sandbags in view of windy conditions at a hotel on Oahu.  Dep. of
Mr. Anderson 30-32, attached as Ex. H to ATT.'s Mot.  ATTCO's
vice-president of sales, Mr. Anderson, testified in his
deposition that he did not configure the Booth at the Hilton
Waikoloa Village with sandbags, guide wires, or stakes because he

did not consider the grand staircase landing "a hazardous location that required that kind of design." Id. at 65.

### 1. Hilton

Under the circumstances, the Court concludes that, as was true of the department store in Leong, Hilton did not design, manufacture, or commercially distribute the Booth.  See 89 Hawai'i at 211, 970 P.2d at 979.  As such, the policies underlying the strict products liability doctrine would not be served by applying the rule to Hilton.  See id.  The Booth was not its "product" for purposes of Plaintiffs' strict products liability claim.  See id.  Hence, Hilton cannot be liable in strict products liability with respect to the Booth.  See id. Plaintiffs do not argue otherwise.  Pls.' Opp'n to Hil.'s Mot. 2.[10]

### 2. ATTCO

Unlike Hilton, ATTCO designed and configured the Booth. Although the metal components of the Booth were obtained from AGAM and essentially assembled pursuant to a design provided by AGAM, ATTCO configured the Booth with, among other things, facades, panels, countertops, and lighting fixtures.  ATTCO did

---

[10] Plaintiffs do not object to the "dismissal (without prejudice)" of the strict products liability claim set forth in count II of the Complaint insofar as that count is asserted against Hilton.  Pls.' Opp'n to Hil.'s Mot. 2.  Plaintiffs concede that, based on the evidence that has been developed, Hilton was not in the business of designing, assembling, or marketing the Booth that struck Mr. Mullaney.  Id.

more than simply assemble the Booth.  The configuration of the Booth was ATTCO's own design.  Although ATTCO plainly designed certain aspects of the Booth, the question remains as to whether it was a "seller" or "lessor" of the Booth such that it was within the chain of distribution.  See Stewart, 52 Haw. at 75, 470 P.2d at 243.  There is no evidence that ATTCO sold the Booth, but it did contract with IDQ to provide certain services at the expo.  Hil.'s Mot. SCSF, Ex. C (ATTCO's contract with IDQ).

The issue therefore narrows to whether, through that contract, ATTCO was a lessor of the Booth.  Pls.' ATT. Mem. 5-8; ATT.'s Reply 3-5.  A "lessor" is "[o]ne who conveys real or personal property by lease," and a "lease," as the term is used with respect to personal property, is "[a] contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration."  Black's Law Dictionary 907, 922  (8th ed. 2004).  When used as a verb, the word "lease" means "[t]o grant the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration."  Id. at 909.[11/]  The right to possession is "[t]he right under which one may exercise control over something to the exclusion of all others; the continuing

_____

[11/] Hawai'i Revised Statutes ch. 490:2A, which governs the leasing of goods, similarly defines the term "lease" in relevant part as "a transfer of the right to possession and use of goods for a term in return for consideration."  Hawai'i Revised Statutes § 490:2A-103; see also infra Discussion Section IV.B.

16

exercise of a claim to the exclusive use of a material object."
Id. at 1201.

In the case at bar, ATTCO had an agreement with IDQ to
perform services in connection with the Hawaii IDQ expo.  Hil.'s
Mot. SCSF, Ex. C at 3 (ATTCO's contract with IDQ).  With respect
to exhibition booths, the contract provides that ATTCO would
"assemble, maintain, and disassemble the required number of 8' x
10' package booths."  Id. at 10.  However, it appears that the
Booth at issue here was not an exhibition booth, but rather a
registration counter.  Dep. of Mr. Anderson 25-26, attached as
Ex. B to Hil.'s Mot. SCSF.  The only term in the contract with
respect to registration counters states that the unit price was
$450.00 with a discount of 50%.  Hil.'s Mot. SCSF, Ex. C at 13
(ATTCO's contract with IDQ).  However, at the time that the
agreement was made, IDQ had not yet ordered a registration
counter, as the agreement states "TBD" or what would appear to be
"to be determined" with respect to the number of counters
required.  See id.; Random House Webster's College
Dictionary 1302 (2d ed. 1997).  After the agreement, IDQ asked
ATTCO via e-mail to arrange to set up the Booth.  ATT.'s Opp'n to
Pls.' ATT. Mot., Ex. A at 17-18 (e-mail correspondence).  ATTCO
claims that, pursuant to IDQ's request, ATTCO brought the Booth
to the Hilton Waikoloa Village and set it up at the location
designated by IDQ, the grand staircase landing.  ATT.'s Reply 5;

17

see also ATT.'s Opp'n to Pls.' ATT. Mot., Ex. A at 28 (ATTCO's work order regarding the Booth); Dep. of Mr. Anderson 66, attached as Ex. L to ATT.'s Reply.

ATTCO contends that it did not relinquish possession of the Booth to IDQ.  See ATT.'s Reply 5.  While the parties' agreement does not speak to the issue of possession, the evidence regarding their course of performance tends to indicate that, once ATTCO set up the Booth, IDQ placed its materials in the Booth and its employees were situated there to provide those materials to the attendees of the expo.  See Dep. of Ms. Lorenzen 26-27, attached as Ex. J to ATT.'s Mot.  Indeed, Mr. Mullaney picked up registration materials from IDQ employees located inside the Booth just prior to the incident at issue here.  ATT.'s Mot., Ex. B at 6 (Pls.' Resp. to Interrogs.).  It is true that ATTCO employees were required under its agreement with IDQ to be at the expo in order to "provide proper services to exhibitors and management"[12/] at an "Exhibitor Service Center," but the question remains as to whether ATTCO exercised control over the Booth while the Booth was being used by IDQ.  See ATT.'s Opp'n to Pls.' ATT. Mot., Ex. A at 2 (ATTCO's contract with IDQ). Accordingly, there is a question of fact as to whether ATTCO relinquished possession of the Booth to IDQ during the expo.

---

[12/] "Management" appears to refer to IDQ, as the contract defines "IDQ" as "Show Management."  ATT.'s Opp'n to Pls.' ATT. Mot., Ex. A at 2 (ATTCO's contract with IDQ).

That question precludes a determination of whether ATTCO leased the Booth to IDQ as well as whether the doctrine of strict products liability applies to ATTCO.  ATTCO makes additional arguments as to the strict products liability claim in its moving papers and, therefore, the Court will assume for the sake of argument that ATTCO leased the Booth to IDQ, that ATTCO was engaged in the business of leasing such booths, and that the Booth was ATTCO's "product" for purposes of addressing those contentions.[13]

ATTCO maintains that Plaintiffs' strict products liability claim fails because Mr. Mullaney was not a "consumer" who purchased or leased the Booth.  ATT.'s Mem. 10.  A person injured by a product need not have been a "consumer" of the product in order to assert a strict products liability claim.  It is enough that the person was a "user" of the product.  Stewart, 52 Haw. at 75, 470 P.2d at 243.  The term "user" includes "those who are passively enjoying the benefit of the product, as in the

---

[13] While it is unclear whether the strict products liability doctrine applies to ATTCO, the Court notes that the policy justifications supporting the doctrine would be served by applying the doctrine to ATTCO.  Much like the manufacturer and distributor of the escalator in Leong, ATTCO is positioned most appropriately to shoulder the risk of accidental injuries caused by defective booths as a cost of doing business, and the imposition of such liability would create incentives for the company to guard against defects in the future.  See 89 Hawai'i at 211, 970 P.2d at 979.  Additionally, applying the doctrine to ATTCO would afford maximum protection to persons injured by defective products.  See id.

case of passengers in automobiles or airplanes." Restatement (Second) of Torts § 402A cmt. l (1965).  In the present matter, Mr. Mullaney obtained registration materials for the expo from a person situated in the Booth prior to the incident.  He was clearly using the Booth and was thereby a "user" of the Booth before it fell on him.

In summary, the Court will grant Hilton's motion for summary judgment as to count II of the Complaint, but deny ATTCO's motion for summary judgment as to that count insofar as the motion is premised on the contention that the strict products liability doctrine is inapplicable to ATTCO.

## II.  Counts I and II of the Complaint:  Design Defect Under the Doctrines of Negligent Design and Strict Products Liability

As noted earlier, ATTCO claims that it is entitled to summary judgment as to count II of the Complaint because, even if the strict products liability doctrine applies, there is no evidence that the Booth was defective.  Additionally, Plaintiffs request summary judgement against ATTCO as to count II as well as count I (negligence).  These two counts involve related legal standards.  As such, the Court will first discuss those standards and then address the parties' specific contentions with respect to each count.

A.    **Design Defect Standards**

"Under Hawai'i law, 'plaintiffs in design defect cases may proceed on both a theory of negligence for negligent design and a theory of strict liability in tort for defective design.'" Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 354, 944 P.2d 1279, 1297 (1997) (quoting Ontai, 66 Haw. at 247, 659 P.2d at 742). "'The plaintiff's burden in a negligent design claim is to prove that the manufacturer was negligent in not taking reasonable measures in designing its product to protect against a foreseeable risk of injury and the manufacturer's negligence was a legal cause of the plaintiff's injury.'"  Id. (quoting Wagatsuma v. Patch, 10 Haw. App. 547, 565, 879 P.2d 572, 583 (1994)) (brackets omitted).  "To establish a prima facie claim for strict product liability, the plaintiff has the burden 'to prove (1) a defect in the product which rendered it unreasonably dangerous for its intended or reasonably foreseeable use; and (2) a causal connection between the defect and the plaintiff's injuries.'"  Acoba v. Gen. Tire, Inc., 92 Hawai'i 1, 16, 986 P.2d 288, 303 (1999) (quoting Tabieros, 85 Hawai'i at 354, 944 P.2d at 1297) (brackets omitted).

"Pursuant to either theory, it is 'the legal duty of manufacturers to exercise reasonable care in the design and incorporation of safety features to protect against foreseeable dangers.'"  Tabieros, 85 Hawai'i at 354, 944 P.2d at 1297

21

(quoting Ontai, 66 Haw. at 247, 659 P.2d at 742) (brackets and ellipsis omitted).  "Accordingly, 'the failure of a manufacturer to equip its product with a safety device may constitute a design defect.'"  Id. (quoting Ontai, 66 Haw. at 243, 659 P.2d at 740) (brackets omitted).  "Generally, whether a product is unreasonably dangerous is a question for the trier of fact." Acoba, 92 Hawai'i at 16, 986 P.2d at 303; see also Tabieros, 85 Hawai'i at 355, 944 P.2d at 1298 ("'[I]t is ordinarily a question for the jury as to whether or not a failure to install a safety device creates an unreasonable risk.'" (quoting Wagatsuma, 10 Haw. App. at 570, 879 P.2d at 585) (emphasis omitted)).

"A plaintiff may establish a defect for purposes of either strict liability or negligence under three approaches: (1) the 'consumer expectation' test; (2) the 'risk-utility' test; and (3) the 'latent danger' test." Acoba, 92 Hawai'i at 17, 986 P.2d at 304.  The Court will discuss the first two tests here. The third test is addressed in a later section.  See infra Discussion Section III.

Under the "consumer expectation" test, "'a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.'"  Tabieros, 85 Hawai'i at 368, 944 P.2d at 1311 (quoting Ontai, 66 Haw. at 242, 659 P.2d at 739-40) (emphasis omitted).

22

In other words, "'it is enough that the plaintiff demonstrates that because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety.'"  Id. (quoting Ontai, 66 Haw. at 241, 659 P.2d at 739).

And under the "risk-utility" test, "'a product may . . . be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.'"  Ontai, 66 Haw. at 242, 659 P.2d at 740 (quoting Barker v. Lull Eng'g Co., Inc., 573 P.2d 443, 456 (Cal. 1978)); see also Tabieros, 85 Hawai'i at 366-67, 944 P.2d at 1309-10 (setting forth the "risk-utility" factors).  With an eye toward the foregoing standards, the Court will now turn to the parties' arguments as to counts I and II of the Complaint.

**B.   Count I:  Negligent Design:  Reasonably Foreseeable Risk of Harm**

In count I of the Complaint, Plaintiffs claim that, on and prior to January 5, 2006, Defendants negligently failed to design, construct, position, store, use, and maintain the Booth in a reasonably safe condition for its intended purposes.  Compl. ¶ 11.  In order to prevail on the negligent-design aspect of this claim, Plaintiffs must show (1) that ATTCO was negligent in not

taking reasonable measures in designing the Booth to protect against a foreseeable risk of injury and (2) that ATTCO's negligence was a legal cause of Mr. Mullaney's injury. <u>See</u> <u>Tabieros</u>, 85 Hawai'i at 354, 944 P.2d at 1297.

The risk of harm in this particular case arises from the Booth's possible potential to fall onto and injure its users in severe windy conditions. As previously noted, on one occasion prior to the incident at issue here and at a different location, ATTCO took precautions against windy conditions by configuring a booth to be anchored down with sandbags. Dep. of Mr. Anderson 30-32, attached as Ex. H to ATT.'s Mot. It conceivably could have done so here, as it had used sandbags during the Hawaii IDQ expo to secure other items such as drapes and signs. Dep. of Mr. Anderson 32-35, attached as Ex. 1 to Pls.' Opp'n to ATT.'s Mot. Indeed, at the hearing on the parties' motions, ATTCO's counsel represented that ATTCO had used sandbags to secure a booth located at the grand staircase landing for a company called Hilo Hattie at the Hawaii IDQ expo. Counsel explained that sandbags were necessary for this particular booth because it was recognized as top-heavy and cylindrical in shape. Sandbags may well have prevented the Booth involved in this case from being blown over by a strong gust of wind onto Mr. Mullaney.

The critical question is whether the danger posed by the Booth being blown over by a strong gust of wind was

24

reasonably foreseeable.  <u>See</u> <u>id.</u>  On the one hand, Plaintiffs

press the fact that the Booth was about five times taller (97

inches) than its footprint was deep (20 inches), which would

suggest that the Booth was susceptible to tipping over,

particularly in windy conditions.  Pls.' ATT. Mot. SCSF at 2-3.

In addition, Plaintiffs point out that ATTCO's

proffered engineering expert, Mr. Siah, testified in his

deposition that:  (1) in an "open field" setting, the wind gust

needed to topple the Booth would be 23.61 mph; (2) in a

"suburban" setting, the wind gust necessary to topple the Booth

would be 28.69 mph; and (3) in an "urban" setting, the wind gust

necessary to topple the Booth would be 38.52 mph.  <u>Id.</u> at 4.

Plaintiffs rely on the data provided by the National Oceanic and

Atmospheric Administration's website regarding the wind

conditions at the "Waikoloa Village" weather station, which,

according to Plaintiffs' counsel, is located three to four miles

uphill from the Hilton Waikoloa Village and is higher in

elevation than the hotel.  Pls.' ATT. Mot., Decl. of William H.

Lawson ¶¶ 8-9.  At the weather station, in November 2005 the high

wind gust was 40 mph, in December 2005 the high wind gust was 41

mph, and in January 2006 the high wind gust was 40 mph.  Pls.'

ATT. Mot., Ex. 8 at 1, 3, 5.  The website further indicates that,

at the weather station on January 5, 2006, the day of the

incident, the high wind gust was 40 mph.  <u>Id.</u>, Ex. 7 at 1.  That

wind gust was recorded at approximately 6:45 p.m., just fifteen minutes before the incident allegedly occurred.  Id., Ex. 7 at 2. Thus, assuming that the wind gusts at the grand staircase landing were at least as strong as those at the weather station, the wind gusts at the grand staircase landing on and leading up to January 5, 2006 would appear to have been sufficient to topple the Booth even under Mr. Siah's "urban" scenario.  Pls.' ATT. Mem. 19.

Finally, Mr. Anderson, the vice-president of sales at ATTCO, testified in his deposition that he was responsible for checking weather conditions for events.  Dep. of Mr. Anderson 52, attached as Ex. 1 to Pls.' Opp'n to ATT.'s Mot. SCSF.  He testified that, as a general matter, he is aware that the Big Island can be subject to strong winds and that the winds can cause damage.  Id. at 53-54.  Other than his personal observations, he did not check the weather conditions for the days at the Hawaii IDQ expo in 2006 before putting up the Booth. Id. at 51-52.  Plaintiffs assert that their evidence suggests that the danger of the Booth toppling over was reasonably foreseeable.

On the other hand, ATTCO has submitted evidence that militates in favor of the opposite conclusion.  ATT.'s Mem. 11-13.  ATTCO points out that Plaintiffs' proffered engineering expert, Mr. Calhoun, acknowledged that the Booth could be used outdoors.  Id. at 11.  It further notes that the

company from which it obtained the metal components of the Booth, AGAM, provided no information regarding anchoring or using the Booth in windy conditions.  Dep. of Mr. Anderson 44, attached as Ex. H to ATT.'s Mot.

ATTCO also insists that the gust of wind that toppled the Booth was not reasonably foreseeable.  ATT.'s Mem. 12-13. ATTCO notes that IDQ employees, Ms. Lorenzen and Mr. Ochs, who were working at the Booth during the incident testified in their depositions that, although it was windy on January 5, 2006, the winds were not strong enough to move the Booth prior to the incident, which occurred at 7:00 p.m.  Dep. of Ms. Lorenzen 26-27, attached as Ex. J to ATT.'s Mot.; Dep. of Mr. Ochs 30, 62-65, attached as Ex. K to ATT.'s Mot.  While it was windy, the employees did not voice any concern regarding the wind or the Booth.  Dep. of Ms. Lorenzen 56-57, attached as Ex. J to ATT.'s Mot.; Dep. of Mr. Ochs 30, 62-65, attached as Ex. K to ATT.'s Mot.  Also, Mr. Anderson testified that, when ATTCO set up the Booth on the day before the incident, it experienced no issues with the wind or the stability of the Booth.  Dep. of Mr. Anderson 65-66, attached as Ex. F to ATT.'s Opp'n to Pls.' ATT. Mot.  He also testified that there were no issues with wind regarding the Booth on January 5, 2006 prior to the incident.

27

Id.[14/]  Mr. Anderson further testified that ATTCO was not advised of any wind condition issues prior to the incident.  Dep. of Mr. Anderson 69-70, attached as Ex. H to ATT.'s Mot.

In view of the evidence submitted by the parties, there appears to be a genuine issue of material fact as to whether the danger of the Booth toppling over because of a strong gust of wind was reasonably foreseeable.  The Court will therefore deny Plaintiffs' motion for summary judgment as to count I of the Complaint.  The Court will now turn its attention to count II.

### C.  Count II:  Strict Products Liability:  Reasonably Foreseeable Use

In count II of the Complaint, Plaintiffs allege that ATTCO placed the Booth into service and is responsible for its defective design, construction, positioning, labeling, storage, maintenance, and use.  Compl. ¶ 13.  In order to establish a prima facie case for strict products liability, Plaintiffs have the burden of proving (1) a defect in the Booth which rendered it

---

[14/] ATTCO asserts that it has set up registration units similar to the Booth in the past in outdoor conditions "without incident," citing Mr. Anderson's deposition.  ATT.'s Opp'n to Pls.' ATT. Mot. SCSF ¶ 3.  Mr. Anderson testified that ATTCO had previously set up booths outdoors at six hotels on Oahu, two hotels on Maui, and three hotels on the Big Island.  Dep. of Mr. Anderson 30, attached as Ex. F to ATT.'s Opp'n to Pls.' ATT. Mot.  However, in the cited portions of Mr. Anderson's deposition, he does not state that there were no accidents on those occasions.  See id. at 30-31.  Indeed, the Court has independently reviewed the remaining excerpted pages of Mr. Anderson's deposition that were attached as an exhibit to ATTCO's opposition and was unable to locate a statement to that effect.

28

unreasonably dangerous for its intended or reasonably foreseeable use and (2) a causal connection between the defect and Mr. Mullaney's injuries.  See Acoba, 92 Hawai'i at 16, 986 P.2d at 303.  Plaintiffs may establish a dangerous "defect" through, inter alia, the "consumer expectations" test or the "risk-utility" test.  See id.

The parties refer to both tests in their memoranda, but they do not apply the multi-factor "risk-utility" test.  ATT.'s Mem. 11-13; Pls.' ATT. Mem. 7, 10-13.  It would therefore appear that they are employing the "consumer expectations" test.  Under the "consumer expectation" test, the Booth may be found defective if Plaintiffs establish that the Booth failed to perform as safely as an ordinary consumer would have reasonably expected when used in an intended or reasonably foreseeable manner.  See Tabieros, 85 Hawai'i at 368, 944 P.2d at 1311.  In this case, the Booth was used during windy conditions that caused it to topple over.  Plaintiffs do not contend that ATTCO intended for the Booth to be used in such conditions.  Instead, they appear to assert that ATTCO could have reasonably foreseen that the Booth would be used in such conditions.

The issue of foreseeability has a limited role in the doctrine of strict products liability.  "[I]n a strict products liability action, the issue of whether the seller knew or reasonably should have known of the dangers inherent in his or

her product is irrelevant to the issue of liability." Johnson v. Raybestos-Manhattan, Inc., 69 Haw. 287, 288, 740 P.2d 548, 549 (1987).  "Although highly relevant to a negligence action, it has absolutely no bearing on the elements of a strict products liability claim."  Id. at 288-89, 740 P.2d at 549 (emphasis omitted); see also Boudreau v. Gen. Elec. Co., 2 Haw. App. 10, 15, 625 P.2d 384, 389 (1981) (holding that the trial court erred in instructing the jury that "[a] product is not defective unless it is reasonably foreseeable that it may, as a result of normal use, cause an accident of the general kind or type involved in this case," because the instruction's use of the principle of foreseeability "convert[ed] the doctrine of strict liability into one of negligence").

At the same time, the question of foreseeability does arise in the doctrine of strict products liability in determining whether, under the "consumer expectations" test, the product was used in a "'reasonably foreseeable manner.'"  Tabieros, 85 Hawai'i at 368, 944 P.2d at 1311 (quoting Ontai, 66 Haw. at 242, 659 P.2d at 739-40); see also Milwaukee Elec. Tool Corp. v. Superior Court, 19 Cal. Rptr. 2d 24, 32 (App. 1993) ("In actions premised on strict products liability, just as in actions premised on negligence, an element of foreseeability is involved; liability may not be imposed unless the injury results from a use of the product which is reasonably foreseeable." (internal

quotation marks omitted)).  Accordingly, while the question of
whether a manufacturer could have reasonably foreseen the use of
a product in a particular manner is pertinent in a strict
products liability analysis, the question of whether the
manufacturer could have reasonably foreseen the dangers
associated with the use of the product in that fashion is not.
The former question concerning the foreseeability of use is
generally one of fact.  See Schwartz v. Am. Honda Motor Co., 710
F.2d 378, 381 (7th Cir. 1983) ("[I]f there is any doubt as to the
foreseeability of a particular use, this is a question of fact
for the jury.").  One "factor in determining whether a producer
may reasonably anticipate or foresee a use put to the product is
the environment in which the product will be used," as "[a]
manufacturer must anticipate the nature of the environment in
which the product is to be used."  Henkel v. R & S Bottling Co.,
323 N.W.2d 185, 192 (Iowa 1982).

　　　　In the case at bar, the issue is whether ATTCO could
have reasonably foreseen that the Booth would be used in an area
that was subject to strong gusts of wind.  The evidence reviewed
in the previous section regarding the foreseeability of the wind
conditions at the Hilton Waikoloa Village in general, and at the
grand staircase landing in particular, indicates that this
question should be decided by the jury.  The evidence submitted
by Plaintiffs suggests that the wind gusts were reasonably

foreseeable, whereas ATTCO's evidence is to the contrary.  <u>See</u> <u>supra</u> Discussion Section II.B.2.[15/]  Accordingly, there is a genuine issue of material fact as to whether ATTCO could have reasonably foreseen that the Booth would be used in an area that was subject to strong gusts of wind.  <u>See</u> <u>Schwartz</u>, 710 F.2d at 381.  The Court will accordingly deny Plaintiffs' and ATTCO's motions for summary judgment as to count II of the Complaint.

To recap, the Court will deny Plaintiffs' motion for summary judgment as to count I of the Complaint and deny Plaintiffs' and ATTCO's motions for summary judgment as to count II.

## III. Count IV of the Complaint:  Failure to Take Precautions and to Warn

In count IV of the Complaint, Plaintiffs contend that Defendants failed to take reasonable steps to test the Booth, to make themselves otherwise aware of the dangers posed by the Booth, or to warn others, including Mr. Mullaney, of the dangers posed by the Booth.  Compl. ¶ 21.  Hilton and ATTCO seek summary judgment as to this count.

---

[15/] Of course, the evidence discussed in the previous section addressing whether ATTCO could have reasonably foreseen that a strong gust of wind would blow the Booth over is irrelevant for purposes of a strict products liability analysis under the "consumer expectations" test.  <u>See</u> <u>Johnson</u>, 69 Haw. at 288, 740 P.2d at 549.

A.   **Hilton**

Hilton construes count IV as a claim of negligence.
Hil.'s Mem. 10-11.  It asserts that the allegations in the count
do not constitute a separate cause of action, but are simply
duplicative of the allegations of negligent conduct set forth in
counts I (negligence) and V (premises liability).  Id.  In
response, Plaintiffs advance the same arguments that they made in
their motion for summary judgment against Hilton.  Pls.' Opp'n to
Hil.'s Mot. 2-4.  Those arguments appear to be based on a
premises liability theory.  See id.  Accordingly, as against
Hilton, count IV would appear to set forth a premises liability
claim that is duplicative of the premises liability claim
asserted in count V.

Hilton essentially contends that it is entitled to
summary judgment as to count IV because the allegations in the
count are redundant and duplicative of counts I and V.  Hil.'s
Mot. 2; Hil.'s Mem. 10-11.  However, mere redundancy is not a
ground for summary judgment.  Summary judgment is appropriate
where a party is entitled to judgment as a matter of law.  See
Fed. R. Civ. P. 56.  Still, redundancy is an appropriate ground
for a motion to strike.  The Court will therefore construe
Hilton's motion as a motion to strike under Fed. R. Civ.
P. 12(f), which states that a court may strike from a pleading
any "redundant" matter.  Pursuant to that provision, the Court

33

will strike the claim against Hilton set forth in count IV of the Complaint insofar as the count is duplicative of the negligence claims asserted in counts I and V.

In addition, the Court notes that count IV could be construed as a strict products liability claim.  To the extent that count IV asserts a strict products liability claim against Hilton, the Court will grant Hilton's motion for summary judgment as to count IV in light of its earlier conclusion that the Booth is not Hilton's "product."  See supra Discussion Section I.B.1.

### B.   ATTCO

ATTCO views count IV as alleging a claim of products liability in light of the "latent danger" test.  ATT.'s Mem. 15; see also supra Discussion Section II.A.  Under that test, a

> product is defective in design, even if faultlessly made, if the use of the product in a manner that is intended or reasonably foreseeable, including reasonably foreseeable misuses, involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warnings of the danger.

Tabieros, 85 Hawai'i at 367, 944 P.2d at 1310 (brackets and emphasis omitted).  By the same token, "a product cannot be defective merely because the manufacturer failed to provide an accompanying warning regarding an open and obvious danger."  Id. at 370, 944 P.2d at 1313.

34

In view of this test, ATTCO essentially contends that no warning regarding the possibility of the Booth falling over in gusty conditions was necessary since the strong gust of wind was not reasonably foreseeable.  ATT.'s Mem. at 15-16.  However, the Court has already concluded that there is a genuine issue of material fact as to whether the Booth's use in gusty conditions was reasonably foreseeable.  See supra Discussion Section II.C.

ATTCO next argues the wind was an "open and obvious" condition that was easily discovered by the users of the Booth. ATT.'s Mem. at 16.  While the wind was an open and obvious condition, there is a genuine issue of material fact as to whether the risk of the Booth being blown over by what appears to have been an ordinary gust of wind was open and obvious.  See Pls.' ATT. Mot., Ex. 8 at 1, 3, 5, 7.  That "substantial danger" seems to have gone unnoticed by Mr. Mullaney as well as the IDQ employees, Ms. Lorenzen and Mr. Ochs, who were working at the Booth prior to the incident.  See Tabieros, 85 Hawai'i at 367, 944 P.2d at 1310.  The Court will accordingly deny ATTCO's motion for summary judgment as to count IV of the Complaint to the extent that the count asserts a products liability claim.

To summarize, the Court will grant Hilton's motion to strike count IV of the Complaint insofar as the count is duplicative of counts I and V.  The Court will also grant Hilton's motion for summary judgment as to count IV of the

Complaint insofar as the count asserts a strict products
liability claim.  However, the Court will deny ATTCO's motion for
summary judgment as to that count inasmuch as the count advances
a products liability claim.

## IV.  Count III of the Complaint:  Breach of Warranty

        In count III, Plaintiffs maintain that the Booth was
expressly or impliedly warranted by Defendants to be safely
designed, built, manufactured, constructed, labeled, distributed,
stored, used, and maintained for the general public in Hawai'i
and elsewhere.  Compl. ¶ 17.  They insist that, as it was used at
the Hilton Waikoloa, the Booth did not meet industry standards
and safety requirements.  Id.  Plaintiffs maintain that the Booth
was dangerously designed, built, manufactured, constructed,
labeled, distributed, used, and stored.  Id.  Plaintiffs posit
that the Defendants placed the Booth into the stream of commerce
and are responsible for breaches of express or implied
warranties.  Id.  Plaintiffs, Hilton, and ATTCO seek summary
judgment as to this claim.

### A.  Hilton

        Hilton asserts that the claim fails because it had no
contractual relationship with Mr. Mullaney with respect to the
Booth.  Hil.'s Mem. 10.  "A warranty results from the contractual
relationship existing between the parties."  Au v. Au, 63 Haw.
210, 218, 626 P.2d 173, 180 (1980).  For example, "a warranty

arises from the contractual relationship between buyer and seller, and a breach of warranty constitutes a breach of contract." Schulz v. Honsador, Inc., 67 Haw. 433, 436, 690 P.2d 279, 282 (1984), overruled on other grounds, Blair v. Ing, 96 Hawai'i 327, 336, 31 P.3d 184, 193 (2001).  Here, IDQ, not Hilton, contractually obtained the services of ATTCO to set up the Booth.  Hil.'s Mot. SCSF ¶¶ 4-6.  Hilton did not contract with ATTCO and was not a party to the contract between IDQ and ATTCO regarding the Booth.  Id.  Thus, Hilton could not have breached a contract with respect to the Booth.  Plaintiffs do not argue otherwise.  See Pls.' Opp'n to Hil.'s Mot. 2.  They do not object to the "dismissal (without prejudice)" of count III of the Complaint insofar as the count is alleged against Hilton.  See id.  The Court will therefore grant Hilton's motion for summary judgment as to count III.

**B.    ATTCO**

ATTCO contends that the breach of warranty claim fails because there was no contract between ATTCO and Plaintiffs. ATT.'s Mem. 14.  ATTCO did have a contract with IDQ to provide the Booth.  ATT.'s Mot. SCSF ¶ 8; Hil.'s Mot. SCSF, Ex. C (ATTCO's contract with IDQ).  Hawai'i Revised Statutes ("HRS") ch. 490:2A governs the leasing of goods.  HRS § 490:2A-103 defines "lease" as "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale,

including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease."  In this case, as previously noted, there is a question of fact as to whether IDQ had a right to possess the Booth.  That question precludes a determination of whether ATTCO leased the Booth to IDQ.  <u>See</u> <u>supra</u> Discussion Section I.B.2.  ATTCO has advanced additional arguments as to count III and, therefore, the Court will assume <u>arguendo</u> that ATTCO leased the Booth to IDQ and that ATTCO was a "merchant" with respect to goods of that kind for purposes of evaluating those contentions.  <u>See</u> HRS §§ 490:2A-103(c), 490:2-104(1) (defining "merchant").

By virtue of the lease, the warranties provided in HRS §§ 490:2A-212 (merchantability) and 490:2A-213 (fitness for a particular purpose) were implied by operation of law.  Those warranties were clearly made to IDQ, the lessee of the Booth. The question is whether those warranties apply to Mr. Mullaney, who was not a party to the agreement.  HRS § 490:2A-216, entitled "Third-party beneficiaries of express and implied warranties," provides in relevant part that:  "A warranty to or for the benefit of a lessee under this Article, whether express or implied, extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty."  In the case at bar, Mr. Mullaney was attending the Hawaii IDQ expo and had just obtained his

38

registration materials from IDQ employees at the Booth when the Booth fell on him.  He is clearly a person who could have been reasonably expected to use and be affected by the Booth.  See HRS § 490:2A-216.  Consequently, ATTCO's implied warranties, as well as any express warranties, to IDQ also extended to Mr. Mullaney.

ATTCO and Plaintiffs both contend that they are entitled to summary judgment insofar as count III asserts an implied warranty claim for the reason that they are entitled to summary judgment as to the strict products liability claim in count II.  ATT.'s Mem. 13-15; Pls.' ATT. Mem. 8.  "[W]here a plaintiff seeks to recover for personal injury in warranty, the elements of the action should be governed by the same policies which presently shape the elements of a tort strict products liability claim."  Larsen v. Pacesetter Sys., Inc., 74 Haw. 1, 22, 837 P.2d 1273, 1284 (1992).  "[T]o bring an action in implied warranty for personal injury a plaintiff is required to show product unmerchantability sufficient to avoid summary judgment on the issue of defectiveness in a tort strict products liability suit."  Id. at 22, 837 P.2d at 1284-85.  In this case, the Court has concluded that genuine issues of material fact as to the issue of defectiveness which preclude the entry of summary judgment in the strict products liability claim asserted in count II of the Complaint.  See supra Discussion Section II.C.  The Court will therefore deny Plaintiffs' and ATTCO's motions for

39

summary judgment as to the implied warranty claim set forth in count III.

In summary, the Court will grant Hilton's motion for summary judgment as to count III of the Complaint, but deny Plaintiffs' and ATTCO's motions for summary judgment as to that count.

## V.  Count V of the Complaint:  Premises Liability

In count V of the Complaint, Plaintiffs allege (1) that Hilton negligently failed to maintain the property where Mr. Mullaney was injured in a manner which was reasonably safe and (2) that it failed to warn of the dangers posed by such failure. Compl. ¶ 24.  Plaintiffs seek summary judgment as to this claim.

"[T]he general rule with respect to all landowners is that 'a possessor of land, who knows or should have known of an unreasonable risk of harm posed to persons using the land, by a condition on the land, owes a duty to persons using the land to take reasonable steps to eliminate the unreasonable risk, or warn the users against it.'" Richardson v. Sport Shinko, 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994) (quoting Corbett v. Ass'n of Apartment Owners of Wailua Bayview Apartments, 70 Haw. 415, 415, 416, 772 P.2d 693, 693 (1989)) (brackets and emphasis omitted). "[T]he question whether one has acted reasonably under the circumstances is for the trier of fact to determine." Id.

40

In this case, Hilton owned and operated the Hilton
Waikoloa Village.  It therefore owed a duty to Mr. Mullaney to
take reasonable steps to eliminate conditions which pose
unreasonable risks of harm or to warn against them if it knew or
should have known of such conditions.  See id.  The condition
that created an allegedly unreasonable risk of harm in this case
was, according to Plaintiffs, the Booth's susceptibility to
tipping over in severe windy conditions.  Hilton did not take the
step of advising ATTCO of the strong winds prior to the incident.
See Dep. of Mr. Anderson 69-72, attached as Ex. 2 to Pls.' ATT.
Mot.; Dep. of Ms. Mui 36, attached as Ex. 1 to Pls.' Hil. Mot.

The question is whether Hilton knew or should have
known of the condition.  Plaintiffs answer this question in the
affirmative, citing the deposition testimony of the Hilton
Waikoloa Village's event planning supervisor, Ms. Mui.  Pls.'
Hil. Mem. 3.  She testified that she was aware that the grand
staircase landing at the hotel was subject to strong winds.  Dep.
of Ms. Mui 33, 34, 37, attached as Ex. 1 to Pls.' Hil. Mot.  She
knew the area well because it was one minute's walk from her
office.  Id. at 54.  She also knew that the Booth was going up in
that location.  Id. at 59.  Ms. Mui's testimony suggests that
Hilton should have known that the Booth would be subject to

strong winds—but not necessarily that it was susceptible to being blown over by such winds.[16]

Hilton has submitted evidence which goes the other way. It shows that, on the day of the incident, the wind conditions required that the papers in the Booth be weighed down, but the wind conditions were not strong enough to move the Booth until a sudden gust blew it over.  Hil.'s Opp'n to Pls.' Hil. Mot. SCSF

---

[16] Plaintiffs also rely on Mr. Anderson's testimony regarding a conversation he had with Ms. Mui.  Pls.' Hil. Mem. 3. Mr. Anderson testified that the conversation took place at some point between the day after the incident on January 5, 2006 and shortly after the completion of the expo on January 8, 2006, but Hilton's counsel represented at the hearing on the motions that the conversation occurred on the night of the incident.  Dep. of Mr. Anderson 39, 68, 71, 74, attached as Ex. 2 to Pls.' Hil. Mot. Mr. Anderson testified that Ms. Mui made a telephone call to him to evaluate the incident.  Id. at 39, 74.  They discussed how the winds had picked up because that was evidently what had caused the Booth to tip over.  Id. at 39.  Ms. Mui complained and commented as to the "lack of wisdom in placing the [Booth at the grand staircase landing]."  Id. at 68.  She asked why ATTCO had not allowed for the wind condition at that location.  Id. at 68-69.  Mr. Anderson responded, "[W]hy didn't you tell me this before?"  Id. at 73.  Ms. Mui did not really have a response. Id. at 73.  They then discussed what ATTCO "could have done" and what it "could do in the future."  Id. at 71.  Ms. Mui indicated that the "wind gusts were a hazard [at the grand staircase landing]," and that ATTCO needs "to take appropriate steps in the future . . . when . . . using equipment in that space."  Id. at 71-72.

Hilton contends that Ms. Mui's statements to Mr. Anderson are inadmissible because they are evidence of subsequent remedial measures under Fed. R. Evid. 407.  Hil.'s Opp'n to Pls.' Hil. Mot. 11.  The Court finds that there is insufficient information at this time to determine whether Ms. Mui's statements were subsequent remedial "measures" within the meaning of the rule. Even if Ms. Mui's statements are admissible, there would still be a question of fact as to whether Hilton should have known of the danger posed by the Booth for the reasons set forth below.

¶¶ 16-18, 20, 22, 24-25.  In addition, Ms. Mui testified in her deposition that all of the outside areas at the Hilton Waikoloa Village have the same exposure to wind.  Dep. of Ms. Mui 37, attached as Ex. A to Hil.'s Opp'n to Pls.' Hil. Mot. SCSF.  She further testified that there have never been any events at the Hilton Waikoloa Village during the time she has been there where registration counters were blown over.  Id.  Ms. Mui also noted that she could not recall any events where other structures that were set up by an entity hosting an event were blown over.  Id. Hilton also points out that, when Mr. Anderson was asked whether ATTCO had put up any counters or booths at the grand staircase landing prior to the incident at issue here, he testified that, on one prior occasion, he was asked to put up an "exhibit" at that location.  Dep. of Mr. Anderson 68, attached as Ex. B to Hil.'s Opp'n to Pls.' Hil. Mot. SCSF.  He further testified that, on that occasion, there were no issues or concerns with wind conditions.  Id.

Plaintiffs contend that Ms. Mui's and Mr. Anderson's testimony regarding the absence of prior events is inadmissible. Pls.' Hil. Reply 6.  "'Evidence of the absence of prior accidents is admissible, but the party seeking to rely on it must show that conditions during the period in question were substantially similar to those prevailing at the time of the accident.'" Pittman v. Littlefield, 438 F.2d 659, 662 (1st Cir. 1971)

(quoting <u>Howe v. Jameson</u>, 13 A.2d 471 (N.H. 1940)). This standard has been applied in cases in which evidence of the absence of accidents is offered to show a lack of notice. <u>See Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.</u>, 716 F.2d 373, 376 (6th Cir. 1983); <u>Higgins v. Hicks Co.</u>, 756 F.2d 681, 685 (8th Cir. 1985). Additional requirements have been imposed when a party seeks to use such evidence to establish the absence of a dangerous condition, particularly in products liability cases. <u>See</u> <u>Forrest v. Beloit Corp.</u>, 424 F.3d 344, 355-56 (3d Cir. 2005); <u>cf.</u> <u>Jones v. Aero/Chem Corp.</u>, 921 F.2d 875, 879-80 (9th Cir. 1990).

In the present matter, Hilton's evidence regarding the absence of prior incidents lacks proper foundation. Hilton has not established that Ms. Mui was working at the Hilton Waikoloa Village when the "exhibit" that Mr. Anderson set up at the grand staircase landing was in place or that the "exhibit" included a registration booth that was substantially similar to the Booth at issue here. Furthermore, Hilton has not shown that the wind conditions during the other events that involved booths or other objects were substantially similar to the conditions at the Hawaii IDQ expo on January 5, 2006. Accordingly, the Court concludes that Hilton has not provided the requisite foundation for the evidence regarding the absence of prior incidents. The

44

Court therefore declines to consider that evidence in ruling on Plaintiffs' motion.

Nevertheless, Hilton's evidence that the strong gust of wind was sudden and that winds on the day of the incident were not particularly strong, counterbalanced against the evidence that Plaintiffs have presented, demonstrates that there is a genuine issue of material fact as to whether Hilton should have known that the Booth was susceptible to being blown over by those strong winds.  The Court will therefore deny Plaintiffs' motion for summary judgment as to count V of the Complaint.  For the same reason, the Court also declines to enter summary judgment against Plaintiffs as to count V sua sponte as Hilton has requested.  See Hil.'s Opp'n to Pls.' Hil. Mot. 12–13.

## VI.   Counts VI and VII of the Complaint:  Punitive Damages Claims

In count VI of the Complaint, Plaintiffs contend that Defendants were grossly negligent in failing to conduct their activities in such a manner as to protect the members of the general public, including Mr. Mullaney, against foreseeable injuries and harm.  Compl. ¶ 27.  And, in count VII of the Complaint, Plaintiffs maintain that the acts alleged in the Complaint were done wantonly, with reckless disregard for the safety of the public in general, and Mr. Mullaney in particular, or with legal malice.  Id. ¶ 30.  Based on these two counts,

45

Plaintiffs make a claim for punitive damages against Defendants. Id. ¶ 39.

### A.    Independent Punitive Damages Claims

"Punitive or exemplary damages are generally defined as those damages assessed in addition to compensatory damages for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future." Masaki v. Gen. Motors Corp., 71 Haw. 1, 6, 780 P.2d 566, 570 (1989).  "[A] claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action." Ross v. Stouffer Hotel Co., 76 Hawai'i 454, 644, 879 P.2d 1037, 1049 (1994); see also Kang v. Harrington, 59 Haw. 652, 660, 587 P.2d 285, 291 (1978) ("An award of punitive damages is purely incidental to the cause of action.").  In the case at bar, count VII of the Complaint asserts a claim of punitive damages and count VI makes a claim of gross negligence to recover punitive damages.  Compl. ¶ 39. Gross negligence is indeed simply one form of conduct that has "traditionally" served as a predicate for the imposition of punitive damages, that is, an "'entire want of care which would raise the presumption of a conscious indifference to consequences.'" See Ditto v. McCurdy, 86 Hawai'i 84, 91, 947 P.2d 952, 959 (1997) (quoting Masaki, 71 Haw. at 11, 780 P.2d at 572); id. at 92, 947 P.2d at 960 (reasoning that the jury need

only "find either willful misconduct or entire want of care, to wit, gross negligence, in order to properly award punitive damages" (emphasis omitted)); id. (determining that there was an abundance of clear and convincing evidence upon which the jury could rely to find that the doctor's care of the patient was "grossly negligent and therefore reckless and consciously indifferent to the consequences that could arise"); Pancakes of Hawaii v. Pomare Props. Corp., 85 Hawai'i 286, 293, 944 P.2d 83, 90 (App. 1997) ("'Gross negligence includes indifference to a present legal duty . . . .'" (quoting Iddings v. Mee-Lee, 82 Hawai'i 1, 23, 919 P.2d 263, 285 (1996) (Ramil, J., dissenting)) (brackets and ellipsis omitted)); Black's Law Dictionary (defining "gross negligence" as:  "1.  A lack of slight diligence or care.  2.  A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages." (citation and emphasis omitted)).

Insofar as counts VI and VII advance independent claims for gross negligence and punitive damages, Hilton is entitled to summary judgment as to those counts.  And the Court will grant ATTCO's motion for summary judgment as to counts VI and VII to the extent that those counts assert independent claims for punitive damages, but will deny ATTCO's motion as to count VI insofar as it asserts an independent claim of gross negligence.

See <u>United States ex rel. Lockyer v. Haw. Pac. Health</u>, 490 F.
Supp. 2d 1062, 1088-89 (D. Haw. 2007) (holding that, to the
extent that the complaint could be read to allege a separate and
independent cause of action for punitive damages, the defendant
would be entitled to summary judgment on that count); <u>Milberger
v. KBHL, LLC</u>, 486 F. Supp. 2d 1156, 1167-68 (D. Haw. 2007)
(indicating that a claim of gross negligence is incidental to a
separate cause of action and cannot be asserted as an independent
claim for punitive damages); <u>Hale v. Hawaii Publs., Inc.</u>, 468 F.
Supp. 2d 1210, 1233 (D. Haw. 2006) (granting the defendants'
motion for summary judgment as to a separate claim for punitive
damages, but noting that the plaintiff could seek punitive
damages as part of her prayer for relief).

**B.   Derivative Punitive Damages Claims**

The residual question is whether Defendants are
entitled to summary judgment as to counts VI and VII to the
extent that those counts are merely derivative of other counts in
the Complaint, particularly those asserting claims of negligence
and strict products liability.  Punitive damages may be imposed
in connection with a claim of negligence or strict products
liability "where the plaintiff proves the requisite aggravating
conduct on the part of the defendant."  <u>See</u> <u>Masaki</u>, 71 Haw.
at 10-11, 780 P.2d at 572-73 (noting that "punitive damages are
recoverable in tort action based on negligence" and perceiving

48

"no reason why punitive damages may not also be properly awarded in a products liability action based on the underlying theory of strict liability").

The Hawai'i Supreme Court has explained that:

> In order to recover punitive damages, "the plaintiff must prove by clear and convincing evidence that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences."

Ass'n of Apartment Owners v. Venture 15, Inc., 115 Hawai'i 232, 297, 167 P.3d 225, 290 (2007) (quoting Masaki, 71 Haw. at 16–17, 780 P.2d at 575) (brackets omitted).  "'[P]unitive damages are not awarded for mere inadvertence, mistake, or errors of judgment.'"  Id. (quoting Masaki, 71 Haw. at 7, 780 P.2d at 571) (emphasis omitted); Pancakes of Hawaii, 85 Hawai'i at 293, 944 P.2d at 90 ("[N]either willful misconduct nor gross negligence are synonymous with ordinary negligence.").

Defendants contend that there is no evidence of the aggravating conduct necessary to impose punitive damages.  ATT.'s Mem. 17–21; Hil.'s Mem. 11–13.  The Court will first address Hilton's contentions and then consider the arguments advanced by ATTCO.

1.   **Hilton**

Plaintiffs concede that, as to count VII, "there does not appear to be sufficient evidence to support a punitive damages claim against [Hilton]."  Pls.' Opp'n to Hil.'s Mot. 2. Count VII alleges that Hilton acted wantonly, recklessly, and maliciously.  Compl. ¶ 30.  Yet, at the same time, Plaintiffs maintain that their gross negligence claim in count VI is viable. Pls.' Opp'n to Hil.'s Mot. 5–7.  The recklessness component of Plaintiffs' claim in count VII is also an element of their gross negligence claim in count VI.

As noted previously, a gross negligence claim requires a showing of an entire want of care which would raise the presumption of a conscious indifference to consequences.  Venture 15, 115 Hawai'i at 297, 167 P.3d at 290.  The Hawai'i Supreme Court has demonstrated that this showing establishes recklessness.  In Iddings, the court noted that, "in the context of punitive damages, . . . reckless conduct is capable of being deterred," and the court illustrated this point by citing the "conscious indifference" proposition.  82 Hawai'i at 8, 919 P.2d at 270.  And, in Bright v. Quinn, 20 Haw. 504 (1911), the court appears to have used the terms "conscious" indifference and "reckless" indifference interchangeably.  Id. at 511–12. Furthermore, "reckless" is defined as being "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to

others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk." Black's Law Dictionary 1298.

In view of this definition of "reckless," Plaintiffs' concession as to count VII, insofar as the count has a component of recklessness, is inconsistent with their assertion that their gross negligence claim in count VI remains viable. Therefore, the Court will accept Plaintiffs' concession as to count VII only insofar as the count alleges wanton[17] and malicious conduct and grant Hilton's motion for summary judgment as to count VII insofar as the count is premised upon such conduct and derivative of another claim. What remains is Plaintiffs' claim of gross negligence, which includes an element of recklessness, in counts VI and VII. As noted above, Hilton, as the owner of the Hilton Waikoloa Village, owed Mr. Mullaney a duty to take reasonable steps to eliminate conditions which posed unreasonable risks of harm or to warn against them if it knew or should have known of such conditions. See supra Discussion Section V.

In order to establish gross negligence, Plaintiffs must show that there has been an "entire want of care" on Hilton's part which would raise the presumption of a "conscious indifference to consequences." See Venture 15, 115 Hawai'i

---

[17] "Wanton" is defined as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." Black's Law Dictionary 1613. "In criminal law, wanton [usually] connotes malice (in the criminal-law sense), while reckless does not." Id.

at 297, 167 P.3d at 290.  It is important to emphasize that punitive damages may not be imposed where the "entire want of care" is rooted in mere inadvertence, mistakes, or errors in judgment.  See id.  Rather, the "entire want of care" must be such that one would presume that "the defendant was consciously, i.e., knowingly, indifferent to [the plaintiffs'] rights, welfare and safety."  Burk Royalty Co. v. Walls, 616 S.W.2d 911, 922 (Tex. 1981).  "In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care."  Id.; see also Treco v. Bosick, 199 A.2d 752, 754 (Del. Super. Ct. 1964) (explaining that "conscious indifference" means "a foolhardy 'I-don't-care-a-bit-what-happens' attitude").  This mental attitude is what "lifts ordinary negligence into gross negligence" and what "justifies the penal nature of the imposition of exemplary damages."  Burk Royalty, 616 S.W.2d at 922 (emphasis omitted), cited in 1 Linda L. Schlueter, Punitive Damages § 4.2(A)(2), at 161 (2005).

Apparently addressing the issue of conscious indifference, Hilton points to the evidence of the absence of prior accidents.  Hil.'s Mot. 11.  However, as previously stated, Hilton has failed to lay the requisite foundation for the introduction of such evidence.  See supra Discussion Section V. As such, the Court will not consider that evidence at this time. Hilton also asserts that, although it was windy on the day of the

incident, January 5, 2006, the wind was not strong enough to move the Booth until the incident occurred.  Hil.'s Mot. SCSF ¶¶ 16, 18, 26.  The gust of wind that toppled the Booth appears to have been sudden.

Plaintiffs counter that the senior events manager at the Hilton Waikoloa Village, Ms. Mui, was well aware of the strong winds at the grand staircase landing.  Pls.' Opp'n to Hil.'s Mot. SCSF ¶ 1.  They claim that Ms. Mui approved the placement of the Booth, but did not observe the work being done, which left ATTCO without her specialized knowledge of the wind conditions in the grand staircase landing.  Plaintiffs also assert that Hilton had onsite engineering staff at the Hilton Waikoloa Village.  Pls.' Opp'n to Hil.'s Mot. SCSF, Exs. E, F (information from the Hilton Waikoloa Village's website regarding the hotel's engineering staff).  They contend that Ms. Mui should have requested that an engineer assist ATTCO in making sure that the Booth was safe.  Pls.' Opp'n to Hil.'s Mot. 6-7.

Plaintiffs' evidence indicates that Ms. Mui knew that the grand staircase landing was subject to windy conditions and that the Booth was being situated at that location, but it does not show that she knew that the Booth was susceptible to being blown over.  Plaintiffs have not provided evidence that Ms. Mui actually knew of, and was indifferent to, that risk prior to the incident.  Thus, any want of care on the part of Hilton would not

53

give rise to a presumption that it was consciously indifferent to Mr. Mullaney's welfare.  Its conduct was by no means "aggravated" or "outrageous."  See Masaki, 71 Haw. at 6, 780 P.2d at 570.  At most, the evidence would indicate an inadvertent mistake on Hilton's part in failing to discover the danger posed by the Booth.  The Court will therefore grant Hilton's motion for summary judgment as to counts VI and VII of the Complaint inasmuch as the counts are premised on grossly negligent and reckless conduct and are derivative of another claim.[18]

## 2.   ATTCO

The Court will now turn to the question of whether ATTCO is entitled to summary judgment as to Plaintiffs' punitive damages claims insofar as those claims derive from other claims. As noted previously, as the creator of the Booth, ATTCO had a duty to exercise reasonable care in the design and incorporation of safety features to protect against foreseeable dangers.  See supra Discussion Section II.B.

ATTCO asserts that it has been in business for over twenty years and that, prior to the incident at issue here, there has never been an occasion where a registration booth has fallen over and caused injury.  ATT.'s Mem. 18.  However, as previously

---

[18]  The entry of summary judgment as to the gross negligence claim against Hilton in count VI of the Complaint does not warrant summary judgment as to Plaintiffs' negligence claims in count I (negligence) and count V (premises liability), as a lesser showing is required for those negligence claims.

54

noted, ATTCO has not provided evidence in support of this assertion that its prior events at hotels on Oahu, Maui, and the Big Island were "without incident."  See supra note 14.  Mr. Anderson did testify that, on one occasion prior to the incident, ATTCO set up an "exhibit" at the Hilton Waikoloa Village and that there were no issues or concerns with wind conditions, but ATTCO has not shown that the conditions of the "exhibit" were substantially similar to the conditions of the incident here. See supra Discussion Section V.  As such, the Court does not consider that testimony at this juncture.  Further, ATTCO emphasizes Mr. Anderson's deposition testimony that on only one prior occasion has the use of sandbags been warranted to secure a booth due to windy conditions.  ATT.'s Mem. 18.  In addition to emphasizing its past experience, ATTCO notes that it was not informed that the grand staircase landing was subject to high winds.  Id.

In response, Plaintiffs point out that Mr. Anderson testified in his deposition that he was responsible for determining the wind conditions during events.  Dep. of Mr. Anderson 52, attached as Ex. 1 to Pls.' Opp'n to ATT.'s Mot. SCSF.  Like ATTCO, Plaintiffs emphasize that, on one occasion prior to the incident at issue here, ATTCO configured a registration booth to be anchored down with sandbags so that it would not be blown over in the wind.  Id. at 30-32.  Mr. Anderson

testified that, as a general matter, the Big Island can be
subject to strong winds and that the winds can cause damage.  <u>Id.</u>
at 54.  However, he did not check what the weather conditions
would likely be during the Hawaii IDQ expo in 2006.  <u>Id.</u>
at 51-52.  In ascertaining why Mr. Anderson did not check the
weather conditions, Plaintiffs' counsel inquired as follows:

> Q.   Is this something where you just
> basically rely on what you can observe to
> decide whether it looks like it's going to
> rain, it looks like it's going to be windy?
>
> A.   It would depend on the activity.
>
>      If I were doing a show that was in an
> exterior location, all of it yeah, I probably
> would be concerned.  But in this particular
> case, most of the activity was inside, so it
> wasn't a concern.

<u>Id.</u> at 52.  Thus, the wind conditions outdoors at the grand
staircase landing were not a concern for ATTCO simply because the
majority of its work at the expo was indoors.  <u>See</u> <u>id.</u>

     Based on the testimony of Mr. Anderson, the Court finds
that there is a genuine issue of material fact as to whether
ATTCO exercised an entire want of care that gives rise to a
presumption of conscious indifference to consequences.  <u>See</u>
<u>Venture 15</u>, 115 Hawai'i at 297, 167 P.3d at 290.  The Court will
therefore deny ATTCO's motion for summary judgment as to
Plaintiffs' claim of gross negligence in count VI of the
Complaint and their claim of reckless conduct in count VII,
insofar as those counts are premised on Plaintiffs' claim of

negligence.   However, Plaintiffs have not come forward with evidence showing that ATTCO acted wantonly or maliciously.   The Court will therefore grant ATTCO's motion for summary judgment as to count VII to the extent that it is premised on such conduct and can be read as a derivative claim.

        To summarize, first, the Court will grant Hilton's motion for summary judgment as to counts VI and VII of the Complaint to the extent that those counts assert independent claims for gross negligence and punitive damages.   Second, the Court will grant ATTCO's motion for summary judgment as to counts VI and VII to the extent that those counts assert independent claims for punitive damages, but will deny ATTCO's motion as to count VI insofar as it asserts an independent claim of gross negligence.   Third, the Court will grant Hilton's motion for summary judgment as to those counts insofar as those counts are derivative of other claims.   Fourth, the Court will grant ATTCO's motion for summary judgment as to count VII insofar as that count is premised on wanton or malicious conduct and derivative of another claim.   Fifth, the Court will deny ATTCO's motion for summary judgment as to counts VI and VII insofar as those counts are derivative of another claim and premised on grossly negligent and reckless conduct.

**VII. Defendants' Answers**

Plaintiffs seek summary judgment as to Defendants' defenses of assumption of risk, contributory negligence, and comparative negligence.  In addition, they request that this Court strike the defenses of failure to name an indispensable party, "wrong party," and lack of jurisdiction, as well as Defendants' blanket defenses invoking all other applicable affirmative defenses.  In their motion to strike, they do not supply the relevant legal standard for a motion to strike, but instead rely on the standard for summary judgment.  Pls.' Misc. Defense Mem. 2-3.  Furthermore, in support of their motion to strike, Plaintiffs have submitted evidence and a separate and concise statement of facts.  In ruling on a motion to strike, "[m]atter outside the pleadings normally is not considered."  5C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1380, at 404 (3d ed. 2004).  In order to properly consider the evidence that Plaintiffs have submitted, the Court construes Plaintiffs' motion to strike as a motion for summary judgment.  Indeed, in their reply memorandum, Plaintiffs specifically request summary judgment as to the defenses that they identified in their motion.  Pls.' Misc. Defense Reply 7-9, 12.  The Court will address the defenses in turn below.

**A.    Assumption of Risk, Contributory Negligence, and Comparative Negligence**

Defendants have raised the defenses of assumption of risk, contributory negligence, and comparative negligence in their answers.  Hil.'s Ans. ¶¶ 44, 48; ATT.'s Ans. ¶¶ 26-28. Plaintiffs maintain that there is no evidence indicating that these defenses apply here.  They contend that Mr. Mullaney did not expressly or impliedly assume the risk of being hit by the Booth.  Pls.' Assum. & Neg. Mem. 2.  They further contend that Mr. Mullaney was in no way negligent in connection with the incident.  Id. at 5.  Defendants have voiced no opposition.  The Court agrees with Plaintiffs that there is no evidence supporting the application of the defense of assumption of risk, contributory negligence, or comparative negligence.  The Court will therefore grant Plaintiffs' motion for summary judgment as to those defenses.

**B.    Indispensable Party**

Defendants assert in their answers the defense of failure to name an indispensable party.  Hil.'s Ans. ¶ 46; ATT.'s Ans. ¶ 31.  Plaintiffs assert that there has never been any effort on the part of any party to name or add an additional party.  Pls.' Other Misc. Mem. 5.  They maintain that the only likely candidate who could be added to the proceedings is IDQ, as it hosted the expo where Mr. Mullaney was injured.  Id. Plaintiffs explain that they did not feel that IDQ was necessary

59

to the proceedings and that, if Defendants felt otherwise, they had ample time to add IDQ as a party.  Id.  Plaintiffs assert that IDQ is not an indispensable party.  Id. at 6.

In response, Hilton asserts that IDQ directed ATTCO as to where the Booth was to be set up within the Hilton Waikoloa Village.  Hil.'s Opp'n to Pls.' Misc. Defense Mot. 6.  It contends that neither it nor ATTCO decided, determined, or directed the placement of the Booth in the area where the incident occurred.  Id.  Hilton therefore concludes that, relative to Plaintiffs' basic claim, IDQ is the party actually responsible for the placement of the Booth.  Id.  For its part, ATTCO contends that whether Plaintiffs' failure or refusal to name IDQ has any bearing on the outcome of this case has yet to be seen.  ATT.'s Opp'n to Pls.' Misc. Defense Mot. 4.  It asserts that, at the very least, ATTCO is entitled to argue IDQ's participation in this matter.  Id.

Defendants seem to suggest that IDQ may be a joint tortfeasor and that they should therefore be permitted to demonstrate that IDQ was at fault in this matter.  Notably, Defendants do not contend that IDQ is an indispensable party. Fed. R. Civ. P. 19 "provides that a court must dismiss a civil action if it lacks personal jurisdiction over any 'necessary' and 'indispensable' party."  Hendricks v. Bank of Am., N.A., 408 F.3d 1127, 1135 (9th Cir. 2005).  "[A] joint tort-feasor is not an

60

indispensable party." <u>Union Paving Co. v. Downer Corp.</u>, 276 F.2d 468, 471 (9th Cir. 1960).  Consequently, even if IDQ could be viewed as a joint tortfeasor,[19/] it would not be an indispensable party.  The Court will therefore grant Plaintiffs' motion for summary judgment as to the defense of failure to join an indispensable party.

  **C.   Wrong Party**

        In its answer, ATTCO gave notice that it intends to rely on the defense that liability, if any, to Plaintiffs is that of other parties/persons other than ATTCO.  ATT.'s Ans. ¶ 24.  Plaintiff characterizes this as a "wrong party" defense.  Pls.' Misc. Defense Mem. 5-6.  ATTCO contends that it should be permitted to pursue its defense that Plaintiff identified the wrong party.  ATT.'s Opp'n to Pls.' Misc. Defense Mot. 4.  ATTCO's defense is phrased broadly and could be read as asserting more than just that ATTCO is the wrong party to this action, insofar as it appears to advance the more general contention that ATTCO is not liable in this action.  <u>See</u> Compl. ¶ 24.  Plaintiffs only seem to be seeking summary judgment inasmuch as the defense

---

        [19/] If IDQ is indeed a joint tortfeasor, there is a question as to whether it could be placed on a special verdict form for apportionment of fault in view of the Hawai'i Supreme Court's decision in <u>Moyle v. Y & Y Hyup Shin, Corp.</u>, 118 Hawai'i 385, 387-402, 191 P.3d 1062, 1074-79 (2008), which addresses the requirements for placing a non-party joint tortfeasor on a special verdict form under the Uniform Contribution Among Tortfeasors Act, HRS § 633-1 <u>et seq.</u>

posits that ATTCO is not a proper party to this action.  Pls.'
Misc. Defense Mem. 5-6.  The Court will therefore address that
issue.

"[S]ummary judgment is often appropriate when the
plaintiff has named the wrong party as the defendant."  Nelson v.
Int'l Paint Co., 734 F.2d 1084, 1094 (5th Cir. 1984).  For
example, summary judgment is appropriate where a defendant shows
that it did not own or operate a hotel at which the plaintiff was
injured.  Meltzer v. Hotel Corp. of Am., 25 F.R.D. 62, 63 (N.D.
Ohio 1959); see also 10A Charles Alan Wright et al., Federal
Practice and Procedure § 2729, at 537-39 & n.11 (3d ed. 1998)
(collecting cases).  In this case, it is undisputed that ATTCO
provided the Booth and assembled it at the Hilton Waikoloa
Village.  Therefore, ATTCO is a proper party to this action.
Accordingly, the Court will grant Plaintiffs' motion for summary
judgment as to ATTCO's "wrong party" defense insofar as it
asserts that ATTCO is not a proper party to this action.

    D.  **Jurisdiction**

In its answer, ATTCO raised the defense of lack of
jurisdiction.  ATT.'s Ans. ¶ 32.  ATTCO does not assert that this
Court lacks personal jurisdiction, but instead questions the
Court's subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).
ATT.'s Opp'n to Pls.' Misc. Defense Mot. 4-5.  ATTCO maintains
that there is a disputed fact as to whether the amount in

controversy meets the jurisdictional amount for diversity of citizenship cases.  Id. at 5.

28 U.S.C. § 1332(a)(1) provides in relevant part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and is between . . . citizens of different States."  "Generally, the amount in controversy is determined from the face of the pleadings.  The sum claimed by the plaintiff controls so long as the claim is made in good faith." Crum v. Circus Circus Enters., 231 F.3d 1129, 1131 (9th Cir. 2000) (citation omitted).  "To justify dismissal, 'it must appear to a legal certainty that the claim is really for less than the jurisdictional amount.'" Id. (quoting Budget Rent-A-Car, Inc. v. Higashiguchi, 109 F.3d 1471, 1473 (9th Cir.1997)).  "[A] defendant may secure a dismissal on the ground that it appears to a legal certainty that the claim is really for less than the jurisdictional amount when independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction." Id. (citing Pachinger v. MGM Grand Hotel-Las Vegas, Inc., 802 F.2d 362, 364 (9th Cir. 1986)).

In this case, Plaintiffs alleged in their Complaint that the amount in controversy in this action is in excess of $75,000.  Compl. ¶ 4.  Furthermore, their separate and concise statement of facts indicates that the amount in controversy is in

excess of $75,000, relying on a declaration of counsel.  Pls.'
Misc. Defense Mot. SCSF ¶ 8.  In the declaration, counsel
represents that, at a settlement conference before Judge
Kobayashi, the combined offer of Defendants to resolve these
claims exceeded the amount in controversy threshold of $75,000.
Id., Decl. of William H. Lawson.  ATTCO does not contest this
representation.  See ATT.'s Opp'n to Pls.' Misc.
Defense Mot. 4-5.

The Court finds that the amount in controversy exceeds
the jurisdictional threshold of $75,000.  In addition, it is
undisputed that there is diversity of citizenship in this case.
See Compl. ¶¶ 1-4; ATT.'s Ans. ¶ 3; Hil.'s Ans. ¶ 3.
Jurisdiction was thus properly invoked under 28 U.S.C.
§ 1332(a)(1).  The Court will therefore grant Plaintiffs' motion
for summary judgment as to ATTCO's defense of lack of
jurisdiction.

### E.  Blanket Defenses

In its answer, Hilton asserts any and all defenses set
forth under Fed. R. Civ. P. 8(c) as they may apply.  Hil.'s Ans.
¶ 49.  And, in its answer, ATTCO gives notice that it may assert
other defenses and other matters constituting avoidance or
affirmative defenses as set forth in Haw. R. Civ. P. 8(c).[20]

---

[20] "While state law defines the nature of the defenses, the
Federal Rules of Civil Procedure provide the manner and time in
(continued...)

ATT.'s Ans. ¶ 34.  ATTCO further states that it will seek to amend its answer to allege such defenses.  Id.  Plaintiffs claim that Defendants' wholesale listing of all Rule 8(c) defenses is not in keeping with notice requirements of federal court pleadings.  Pls.' Misc. Defense Mem. 6-7.  Plaintiffs claim that, because there has been no specific disclosure of any other affirmative defenses, they are entitled to summary judgment as to Defendants' blanket defenses.  Id. at 7; Pls.' Misc. Defenses Reply 12.  In response, ATTCO contends that, if Plaintiffs have specific defenses for which they seek summary judgment, then they should move accordingly.  ATT.'s Opp'n to Pls.' Misc. Defense Mot. 5-6.  ATTCO insists that any other defenses which may be asserted at trial should be allowed.  Id. at 6.  Hilton does not address Plaintiffs' contention in its opposition.

The Court will grant Plaintiffs' motion for summary judgment insofar as Plaintiffs seek a determination (1) that Defendants' blanket defenses are not sufficient to properly raise any specific affirmative defense and (2) that affirmative defenses that were not raised have been waived.  See Morrison v. Mahoney, 399 F.3d 1042, 1046 (9th Cir. 2005) ("Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is

---

[20]/(...continued)
which defenses are raised and when waiver occurs."  Healy Tibbitts Constr. Co. v. Ins. Co. of N. Am., 679 F.2d 803, 804 (9th Cir. 1982).

required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived."). However, the Court notes that even waived defenses may be tried by express or implied consent under Fed. R. Civ. P. 15. See Petersen v. Klos, 426 F.2d 199, 203 (5th Cir. 1970) ("'Rule 15(b) of course, is applicable to defenses as well as claims, and to the extent to which it is applicable, it operates as an exception to the rule that defenses not pleaded are waived.'" (quoting Metro. Life Ins. Co. v. Fugate, 168 F.2d 426, 427 (5th Cir. 1948)).

To review, first, the Court will grant Plaintiffs' motion for summary judgment as to Defendants' defenses of assumption of risk, contributory negligence, comparative negligence, and failure to name an indispensable party. Second, the Court will grant Plaintiffs' motion for summary judgment as to ATTCO's defense of "wrong party" and lack of jurisdiction. Third, the Court will grant Plaintiffs' motion for summary judgment as to Defendants' blanket defenses insofar as Plaintiffs seek a determination (1) that Defendants' blanket defenses are not sufficient to properly raise any specific affirmative defense and (2) that affirmative defenses that were not raised have been waived.

## VIII.     Material Facts Not Genuinely In Issue

The final matter before the Court is Plaintiffs'
request for findings as to certain facts that have been admitted
by Defendants or that are not in dispute.  Pls.' Misc. Defense
Mem. 3-4.  Plaintiffs specifically request that this Court make
findings regarding the basic circumstances surrounding the
incident at the Hilton Waikoloa Village.  Id.  In response, ATTCO
contends that, with respect to the facts that it has not
admitted, Plaintiffs could have submitted a request for
admissions under the discovery rules, but they failed to do so.
ATT.'s Opp'n to Pls.' Misc. Defense Mot. 3.  Hilton contends
that, although Fed. R. Civ. P. 56(d)(1) authorizes the Court to
determine facts that are undisputed in ruling on a motion for
summary judgment or partial summary judgment, it is improper for
Plaintiffs to specifically request such a determination without
first requesting summary judgment or partial summary judgment.
Hil.'s Opp'n to Pls.' Misc. Defense Mot. 4-5.

Fed. R. Civ. P. 56(d)(1) directs that:

> If summary judgment is not rendered on the
> whole action, the court should, to the extent
> practicable, determine what material facts
> are not genuinely at issue.  The court should
> so determine by examining the pleadings and
> evidence before it and by interrogating the
> attorneys.  It should then issue an order
> specifying what facts—including items of
> damages or other relief—are not genuinely at
> issue.  The facts so specified must be
> treated as established in the action.

"[T]he primary purpose of the rule is to salvage some results from the effort involved in the denial of a motion for summary judgment."  10B Wright et al., Federal Practice & Procedure § 2737, at 318 (3d ed. 1998).  Yet "[a] Rule 56(d) motion is not a stand-alone motion."  Matsuura v. E.I. du Pont de Nemours & Co., Civ. No. 00-00615 SOM-LEK, 2007 U.S. Dist. LEXIS 11424, at *15 (D. Haw. Feb. 16, 2007).  This is because the rule "does not authorize the initiation of motions the sole object of which is to adjudicate issues of fact which are not dispositive of any claim or part thereof."  SFM Corp. v. Sundstrand Corp., 102 F.R.D. 555, 558 (N.D. Ill. 1984).  Rather, "[t]he procedure prescribed in subdivision (d) is designed to be ancillary to a motion for summary judgment."  10B Wright et al., Federal Practice & Procedure § 2737, at 316.

In the case at bar, Plaintiffs' motion requesting findings of fact is not limited to that request; it also seeks partial summary judgment as to certain affirmative defenses that Defendants have raised, which is proper under Fed. R. Civ. P. 56(d).  See id. at 321 (explaining that Fed. R. Civ. P. 56(d) should be employed to grant partial summary judgment on affirmative defenses).  Furthermore, the basic facts that Plaintiffs seek to establish are plainly relevant to the other three motions for summary judgment that they have filed.  As such, Plaintiffs' Fed. R. Civ. P. 56(d) motion is by no means a

68

stand-alone motion.  In addition, for the reasons discussed above, the Court does not in this Order render summary judgment on the "whole action."  <u>See</u> Fed. R. Civ. P. 56(d)(1).  Therefore, after reviewing the evidence submitted as to the parties' summary judgment motions, in light of Plaintiffs' specific request, and pursuant to Fed. R. Civ. P. 56(d), the Court determines that the following facts are not genuinely in dispute:

> On January 5, 2006, Mr. Mullaney was injured while attending the Hawaii IDQ expo at the Hilton Waikoloa Village, which was owned and operated by Hilton.  A registration booth that had been put up by ATTCO for the IDQ expo fell and struck Mr. Mullaney.  This accident took place in Waikoloa, County of Hawai'i, State of Hawai'i.

Pursuant to Fed. R. Civ. P. 56(d), these facts shall be treated as established in this action.

### <u>CONCLUSION</u>

In light of the foregoing, the Court:

(1)   GRANTS Hilton's motion for summary judgment as to count II of the Complaint (strict products liability);

(2)   DENIES Plaintiffs' motion for summary judgment as to count I (negligence);

(3)   DENIES Plaintiffs' motion for summary judgment as to count II (strict products liability);

(4)   DENIES ATTCO's motion for summary judgment as to count II (strict products liability);

(5)   GRANTS Hilton's motion to strike count IV (failure to take precautions and to

warn) insofar as that count's
allegations are redundant of those in
count I (negligence) and count V
(premises liability);

(6)   GRANTS Hilton's motion for summary
judgment as to count IV (failure to take
precautions and to warn) insofar as that
count asserts a strict products
liability claim;

(7)   DENIES ATTCO's motion for summary
judgment as to count IV (failure to take
precautions and to warn) insofar as that
count asserts a products liability
claim;

(8)   GRANTS Hilton's motion for summary
judgment as to count III (breach of
warranty);

(9)   DENIES ATTCO's motion for summary
judgment as to count III (breach of
warranty);

(10)  DENIES Plaintiffs' motion for summary
judgment as to count III (breach of
warranty);

(11)  DENIES Plaintiffs' motion for summary
judgment as to count V (premises
liability);

(12)  GRANTS Hilton's motion for summary
judgment as to count VI (gross
negligence) and count VII (punitive
damages) insofar as those counts assert
independent claims for gross negligence
and punitive damages;

(13)  GRANTS ATTCO's motion for summary
judgment as to count VI (gross
negligence) and count VII (punitive
damages) to the extent that those counts
assert independent claims for punitive
damages, but DENIES ATTCO's motion as to
count VI (gross negligence) insofar as

it asserts an independent claim of gross negligence;

(14) GRANTS Hilton's motion for summary judgment as to count VI (gross negligence) and count VII (punitive damages) insofar as those counts are derivative of other claims;

(15) DENIES ATTCO's motion for summary judgment as to count VI (gross negligence) and count VII (punitive damages) insofar as those counts are derivative of other claims and premised upon grossly negligent and reckless conduct;

(16) GRANTS ATTCO's motion for summary judgment as to count VII (punitive damages) insofar as that count is derivative of other claims and premised upon wanton or malicious conduct;

(17) GRANTS Plaintiffs' motion for summary judgment as to Defendants' defenses of assumption of risk, contributory negligence, and comparative negligence;

(18) GRANTS Plaintiffs' motion for summary judgment as to Defendants' defense of failure to name an indispensable party;

(19) GRANTS Plaintiffs' motion for summary judgment as to ATTCO's defense of "wrong party";

(20) GRANTS Plaintiffs' motion for summary judgment as to ATTCO's defense of lack of jurisdiction;

(21) GRANTS Plaintiffs' motion for summary judgment as to Defendants' blanket defenses insofar as Plaintiffs seek a determination that (a) Defendants' blanket defenses are not sufficient to properly raise any specific affirmative defense and (b) affirmative defenses

that were not raised have been waived;
and

(22) GRANTS Plaintiffs' motion for a
determination of facts that are not
genuinely in issue.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, June 25, 2009.



_____
Alan C. Kay
Sr. United States District Judge

Mullaney v. Hilton Hotels Corp., Civ. No. 07-00313 ACK-LEK:  Order Granting in
Part and Denying in Part Plaintiffs' and Defendants' Motions For Partial
Summary Judgment